The appealing parties have shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence, the undersigned reach the same facts, with some modification, as those reached by the Deputy Commissioner but modify the conclusions and holding of the Deputy Commissioner. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate order.
 RULINGS ON EVIDENTIARY MATTERS
All objections contained in the various depositions are OVERRULED. Plaintiff's February 16, 1996 motion in limine for protective order and to limit evidence is DENIED.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The defendant is self-insured with Constitution State Service Company providing adjusting services.
3. Plaintiff's average weekly wage was $875.00, yielding a compensation rate of $426.00.
4. On January 13, 1993 the Industrial Commission approved the parties' I.C. Form 21 "Agreement for Compensation for Disability."
5. Defendant paid $426.00 per week in disability compensation to plaintiff under the Form 21 Agreement starting in January 1993 for the period July 9, 1992 and continuing to the hearing before the Deputy Commissioner.
***********
Based upon all of the competent evidence from the record herein, the Full Commission adopts the findings of fact by the Deputy Commissioner with minor modifications as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 46 years old and unemployed. Plaintiff graduated from high school and subsequently received various certificates for competency in avionics and radiotelephone electronics. Plaintiff served in the United States Army and worked at various unskilled jobs until 1986-1988 when his occupation included computer service and repair. Plaintiff is certified to service and to maintain various types of computers.
2. In January 1989 defendant-employer, Sara Lee, hired plaintiff as an information center service administrator. Plaintiff's primary duties included organizing and building a maintenance program for Sara Lee Knit Products Division's personal computer hardware.
3. In April 1992 Sara Lee began a private investigation, unrelated to plaintiff's claim for compensation, into alleged financial improprieties involving plaintiff while employed by Sara Lee.
4. On July 8, 1992, plaintiff was standing on a chair in the computer parts supply room attempting to reach some computer equipment on upper shelves. Plaintiff lost his balance and fell to the floor, striking his head on some metal shelves. Four or five minutes later a co-worker found plaintiff semi-conscious on the floor in the room. Forsyth County EMS arrived at Sara Lee's premises to assist plaintiff, who was nauseated and complaining of head pain in the left temporal area; however, no wounds were found on plaintiff's head.
5. The initial diagnosis from emergency room personnel was concussive syndrome. All neuroimaging studies were negative.
6. The defendant-employer sent plaintiff to neurologist Paul G. Martin, who first saw plaintiff on July 13, 1992. Plaintiff's chief complaints to Dr. Martin were headache, dizziness with most movements, nausea, poor appetite and some blurred vision. He reported a prior fall some twelve years earlier. Dr. Martin diagnosed plaintiff as suffering from a concussion secondary to a fall on July 8, 1992 and took plaintiff out of work.
7. On July 27, 1992 Dr. Martin opined that plaintiff was suffering the effects of post-concussion syndrome including headache, dizziness, blurred vision, and nausea. All of plaintiff's symptoms were expected to take an undetermined period of time to improve.
8. The defendant-employer next sent plaintiff for a second opinion to neurologist William A. Brady who examined plaintiff on August 11, 1992. Dr. Brady recorded plaintiff's symptoms as headaches, nausea, vertigo, tinnitus, loss of concentration and sleep disruption. Neurologic examination and testing was reported as normal. Dr. Brady opined that plaintiff was apathetic and depressed.
9. On or about September 25, 1992, the defendant-employer discharged plaintiff from employment for reasons unrelated to the fall on July 8, 1992. This termination was the result of the investigation by the defendant-employer which began approximately three months prior to July 8, 1992.
10. On September 29, 1992, plaintiff saw Dr. Martin and informed Dr. Martin of his discharge by defendant-employer. Dr. Martin felt plaintiff's condition was unchanged, except for the addition of depression. Dr. Martin's diagnosis was post-concussion syndrome with depression. Plaintiff's depression resulted from a mixture of his post-concussion syndrome and loss of his job. Although post-concussion syndrome does not often "show up" in scans or other physical tests, its effects are sometimes long lasting and are combined generally with elements of depression, particularly when the condition persists. Dr. Martin referred plaintiff to psychologist Daniel Pollock for neuropsychological testing. At the time of the referral to Dr. Pollock, plaintiff was still disabled from work.
11. On October 7, 1992, Dr. Pollock evaluated plaintiff and on October 19, 1992 he performed psychological and neuropsychological testing. Dr. Pollock diagnosed organic mood disorder and major depression which required psychotherapy. Dr. Pollock also found that the psychological and intellectual effects exhibited by plaintiff were caused by his post-concussion syndrome. Plaintiff's condition was clearly an organic mood disorder, and his current state was independent from any previous conditions or pre-existing problems. Plaintiff's condition likely reduced his ability to cope with issues from his past and to deal with his current limitations.
12. The psychological evaluation performed by Dr. Pollock further revealed plaintiff's intellectual performance was slowed significantly. Plaintiff was unable to respond to situations demanding performance under time constraints. His personality evaluation showed significant reactive depression and his personality stance was damaged at this time. Plaintiff's history revealed that he was competent and assertive prior to his head injury. Dr. Pollock's interview material and data do not support a finding that a previous condition may have somehow contributed to plaintiff's present impairment. Plaintiff's general behavior including loss of concentration, blocking, memory loss, dizziness and nausea with motion/driving was consistent with a post-concussion syndrome, and his depression and feeling of inadequacy were related to this significant loss of ability.
13. Immediately following plaintiff's accident on July 8, 1992, plaintiff spent most of his time in a reclining position. Standing and walking caused nausea, vomiting, unsteadiness and dizziness. Plaintiff's speech, memory and balance were noticeably impaired. Plaintiff's other limitations and problems included an inability to drive, to perform chores, to prepare meals, and short-temperedness.
14. The defendant contends that it was unaware of plaintiff's act of embezzlement and financial improprieties until after the Form 21 was signed. Defendant further contends that the allegations of embezzlement and financial improprieties were independent intervening causes of plaintiff's condition, which were attributable to plaintiff's own conduct. The undersigned find that defendant Sara Lee knew of plaintiff's alleged financial improprieties, including his obtaining property by false pretense, on or before September 25, 1992, when Sara Lee discharged plaintiff for his alleged improper activities. Sara Lee knew of plaintiff's conduct prior to the accident on July 8, 1992, before the Form 21 was agreed to and signed by Sara Lee and by Sara Lee's adjusting agent, and before the Form 21 was submitted by Sara Lee's agent to the Industrial Commission for approval in December 1992.
15. Prior to entering into the I.C. Form 21 Agreement and submitting it for approval, the correspondence and medical records show that Sara Lee was also aware that its termination of plaintiff's employment on September 25, 1992 upset plaintiff and could have been a causal factor, along with plaintiff's post-concussion syndrome, in plaintiff's depression, as diagnosed and reported by plaintiff's health care providers directly to Sara Lee in response to its specific inquiries as to a causal connection.
16. The issues of whether plaintiff had a compensable accidental head injury and any resulting depression and/or disability were resolved and decided by the parties when they entered into and agreed to the Form 21 Agreement on December 8, 1992. The parties' stipulations to these matters became the findings and conclusions of the Commission, enforceable as a judgment, when the Commission approved the parties' Form 21 Agreement on January 13, 1993.
17. After the Commission approved the Form 21 Agreement, Sara Lee sent plaintiff to Charlotte neuropsychologist Alexander A. Manning, who conducted extensive neuropsychological testing of plaintiff on March 1, 1993. Plaintiff had improved from the time that the Form 21 was approved until March 1, 1993, but he still suffered from vertigo and nausea, and could only engage in sustained activity for one to one and a half hours. Dr. Manning concluded that plaintiff suffered from neuropsychological deficits consistent with mild impairment of brain functions. He found deficiencies on some of the general indicators of cerebral dysfunction. Plaintiff performed poorly on tasks requiring organization and analysis of ongoing experience, and plaintiff's processing of verbal material for memory storage appeared to be deficient. Dr. Manning suggested treatment by a therapist familiar with cognitive retraining strategies as well as treatment for depression. He felt plaintiff was unlikely to return to his former employment, and he also suggested diagnostic evaluation of plaintiff's vertigo.
18. In March 1993 Sara Lee's agent arranged for plaintiff to present to the Ear, Nose and Throat Department at Bowman Gray School of Medicine for vestibular testing for his vertigo only, with no examination by a physician. In June 1993 Sara Lee's agent was informed that the tests' interpretation showed a marked abnormality. Sara Lee's agent did not agree to further evaluation by an otolaryngologist.
19. During the latter part of 1992 and in 1993, plaintiff continued therapy with Dr. Pollock, who noted plaintiff's primary problems to be depression, low energy and inability to concentrate on any task longer than about two hours, followed by fatigue, dizziness, vertigo and nausea. Dr. Pollock believed that plaintiff's depression was a result of his loss of cognitive abilities caused by the July 8, 1992 accident, rather than the loss of his job at Sara Lee.
20. On July 8, 1993, Sara Lee's agent sent plaintiff back to Dr. Martin, who felt that plaintiff was improved, but continued to suffer from post-concussion syndrome with decreased attention span and lower than normal cognitive functioning. Dr. Martin felt a psychiatric evaluation for plaintiff's depression would be helpful. He referred plaintiff to Winston-Salem psychiatrist Stephen W. Hebert for evaluation.
21. On August 18, 1993, Dr. Hebert evaluated plaintiff, noted his loss of about fifty pounds since the accident, and diagnosed major depression. He prescribed therapy and medication. On September 9, 1993 plaintiff returned to Dr. Hebert, who has treated plaintiff since then through at least May 24, 1996. Dr. Hebert's treatment of plaintiff is a result of plaintiff's post-concussive syndrome with depression caused by his July 8, 1992 accidental head injury.
22. Dr. Hebert opined that plaintiff suffers from moderately severe depression and loss of self-esteem as a result of his July 8, 1992 head injury. Plaintiff exhibited the following signs or symptoms to Dr. Hebert: anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, lack of initiative, difficulty concentrating or thinking, isolation, substantial mood swings and personality change with marked or severe deficiency in concentration and moderate impairment of thought processes.
23. In October 1993 plaintiff pled guilty to criminal charges of obtaining property by false pretense from Sara Lee.
24. On January 25, 1994 plaintiff, without referral from a physician, went to see John S. May, an assistant professor of ear, nose and throat at Bowman Gray School of Medicine. Following examination of plaintiff, Dr. May stated that plaintiff's problems with balance, vertigo, memory loss, headaches and depression were likely related to his post-concussive syndrome following his July 1992 closed head injury. He wrote that plaintiff's depression was most likely caused by his loss of intellectual and physical functions. He recommended repeat vestibular studies, which were conducted on February 16, 1994 and interpreted by Dr. May as showing plaintiff's dependence upon visual input to maintain his equilibrium and balance and as showing a problem with plaintiff's central nervous system, which explained plaintiff's long-standing complaints of vertigo arising from the July 8, 1992 accident. Dr. Hebert testified that in his opinion Dr. May's testing and evaluation were necessary to help determine the nature and extent of plaintiff's injuries secondary to his July 8, 1992 accident.
25. On May 20, 1994 Dr. Hebert referred plaintiff to Winston-Salem psychologist Kevin Wilson for evaluation of plaintiff's rehabilitative potential. Sara Lee refused to pay for any evaluation by Dr. Wilson.
26. On February 10, 1995, Dr. Hebert updated plaintiff's condition which continued to include mental and emotional impairment. Plaintiff had recurrent depression and loss of self-esteem which was totally secondary to his accident. His symptoms were essentially unchanged since May 1994. Plaintiff continued to be disabled due to his becoming exhausted easily and his inability to concentrate for longer than a few hours. Additionally, psychotherapy was improving plaintiff's self-esteem.
27. On May 2, 1995 Sara Lee sent plaintiff for evaluation by Winston-Salem psychiatrist Joseph J. Cutri, who diagnosed post-concussive syndrome and reactive depression. Dr. Cutri found that plaintiff appeared to be benefiting from his psychotherapy as well as his rehabilitation therapy and recommended continuing those treatments. Dr. Cutri did not feel that plaintiff could competently perform the duties of his prior occupation as a systems operator and that plaintiff was unable to be gainfully employed in any occupation for which he has been trained because of his mental impairment. Dr. Cutri considered plaintiff to be well-motivated and a good candidate for vocational rehabilitation.
28. On December 11, 1995 Sara Lee sent plaintiff to be evaluated and tested by Winston-Salem psychiatrist Thomas H. Wagner, whose impression of plaintiff's condition was major depression and a personality disorder.
29. In his May 24, 1996 deposition Dr. Hebert testified that plaintiff continued to be disabled and needed professional psychiatric care and prescription medication due to his July 8, 1992 head injury and resulting depression. Dr. Hebert testified that plaintiff had not misrepresented any symptoms.
30. The undersigned give greater weight to the opinions and testimony of primary treating physician Dr. Hebert due to his numerous observations of and contacts with plaintiff over a two and one-half year period. Dr. Hebert's treatment has helped improve plaintiff's condition and he should continue to treat plaintiff. The undersigned also assign greater weight to those opinions expressed by Dr. Cutri.
31. Defendant has not met its burden to show mutual mistake of fact, fraud, undue influence or misrepresentation which would support its motion to set aside the parties' approved Form 21 Agreement.
33. Plaintiff has not engaged in any fraud or fraudulent conduct concerning his head injury on July 8, 1992, or concerning the nature and extent of his disabling post-concussive syndrome, depression and related symptoms.
34. As a result of the parties entering a Form 21 Agreement for the Payment of Compensation for Disability, a presumption of disability attached to plaintiff's conditions. The defendant has not successfully rebutted that presumption by showing that plaintiff was able to return to work and earn wages equal to or greater than wages earned prior to his injury.
35. Plaintiff has not misrepresented to Sara Lee or to any of his health care providers any of his symptoms or his disability related to his July 8, 1992 head injury.
36. Plaintiff's total disability in the period starting July 8, 1992 and continuing is due to his July 8, 1992 accidental fall and post-concussive syndrome with depression, and not due to any other event or condition. Plaintiff's loss of his job in September 1992, his criminal conviction in October 1993 and Sara Lee's civil lawsuit against him are neither singularly nor in combination a significant causal factor in or an intervening cause of plaintiff's continuing disability in the period after July 8, 1992.
37. After listening to the plaintiff's testimony and having the opportunity to observe his demeanor, the Deputy Commissioner found the plaintiff's testimony to be credible. The Full Commission has the discretion to overturn the Deputy Commissioner's credibility finding, but in this case there is insufficient evidence in the record to elect to do so. The undersigned also find the plaintiff to be truthful and credible with regard to the accident of July 8, 1992 and the resulting injury and consequences of that accident.
38. Plaintiff's July 8, 1992 accidental head injury has caused plaintiff to be easily fatigued after sustained physical activities of only one or two hours. Plaintiff is unable to concentrate for longer than about one to two hours, has mood swings, depression, vertigo, dizziness, nausea and loss of cognitive function which are secondary to his July 8, 1992 accidental head injury.
39. Dr. Hebert is competent to treat plaintiff, and plaintiff has trust in Dr. Hebert and has benefited from his treatment.
40. Defendant's post-hearing motion seeking an order compelling plaintiff to undergo another evaluation and a P.E.T. scan is allowed; however, any interpretation of a P.E.T. scan of plaintiff's brain, whether positive or negative, will not alter the parties' stipulations as contained in the I.C. Form 21 Agreement.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On July 8, 1992 plaintiff sustained a compensable injury by accident to his head which arose out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff's July 8, 1992 accidental head injury resulted in plaintiff's total disability beginning on July 9, 1992. N.C. Gen. Stat. §§ 97-2(9) and 97-29.
3. The plaintiff's total disability in the period starting July 9, 1992 and continuing through at least the May 20, 1996 hearing before the Deputy Commissioner was caused by his original July 8, 1992 head injury while at work at Sara Lee. N.C. Gen. Stat. § 97-29; Horne v. Universal Leaf Tobacco Processors,119 N.C. App. 682, 459 S.E.2d 797 (1995).
4. Defendant knew about plaintiff's financial improprieties which led to plaintiff's employment termination and which formed the basis for plaintiff's subsequent criminal conviction prior to defendant's execution of and entering into the stipulations contained in the Form 21 Agreement. There was no error due to mutual mistake, fraud, misrepresentation or undue influence present which induced Sara Lee to enter into the Form 21 Agreement. The fact that Sara Lee changed its mind and felt it was a mistake to have entered into the Form 21 Agreement is not a sufficient legal basis to set aside the approved Form 21 Agreement. N.C. Gen. Stat. § 97-17.
5. The total disability resulting from plaintiff's July 8, 1992 injury by accident began on July 9, 1992 and continues until further Order of the Commission. N.C. Gen. Stat. § 97-29.
6. As a direct and proximate result of plaintiff's injury by accident on July 8, 1992, plaintiff sustained an injury to his brain, including post-concussion syndrome with depression, and requires further medical treatment and supplies. N.C. Gen. Stat. § 97-25.
7. Plaintiff is entitled to payment of medical expenses incurred in his treatment with Dr. Hebert for so long as said treatment tends to effect a cure or give relief or will tend to lessen the period of disability. N.C. Gen. Stat. §§ 97-25 and97-2(19).
8. Defendant shall pay for the evaluation and testing of plaintiff performed by ENT specialist John S. May of Bowman Gray School of Medicine and psychologist Kevin Wilson. N.C. Gen. Stat. §§ 97-25, 97-89 and 97-27.
9. Defendant is not entitled to a credit for workers' compensation disability benefits paid or to be paid to plaintiff against the restitution which plaintiff was ordered to make to Sara Lee as part of the October 1993 criminal judgment entered against plaintiff. N.C. Gen. Stat. § 97-21.
10. Defendant is entitled to another evaluation and P.E.T. Scan of plaintiff. N.C. Gen. Stat. § 97-25.
***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to attorney's fees awarded below, defendant shall continue paying plaintiff temporary total disability benefits at the rate of $425.00 per week until further Order of the Commission.
2. Defendant shall pay for the evaluation and testing of plaintiff performed by Dr. May and Kevin Wilson, Ph.D.
3. Defendant shall pay for medical treatment by Dr. Hebert who shall remain plaintiff's primary treating physician.
4. Plaintiff's counsel is entitled to a reasonable attorney's fee of every fourth disability compensation check due plaintiff starting with the period May 20, 1996 and continuing until further Order of the Commission.
 ORDER
1. It is hereby ordered that plaintiff shall submit to additional evaluations and a P.E.T. scan. Any interpretation of the P.E.T. scan of plaintiff's brain, whether positive or negative, shall not alter the parties' stipulations as contained in the I.C. Form 21 Agreement.
2. It is further ordered that defendant's motion seeking a transfer of plaintiff's medical care from Dr. Hebert to Dr. Kramer or another neuropsychiatrist at Bowman Gray School of Medicine is DENIED.
3. This Order does not foreclose defendant from presenting additional evidence to the Commission nor does it foreclose either party's right to file a Form 33 Request for Hearing on any remaining issues to rebut plaintiff's presumption of disability.
This the ___ day of July 1999.
 S/_____________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
UNABLE TO SIGN DUE TO ILLNESS:
S/_____________ CHRISTOPHER SCOTT COMMISSIONER
LKM/jth